**Affirmed and Memorandum Opinion filed January 19, 2012.**



In The

# Fourteenth Court of Appeals

### NO. 14-10-00972-CV

## IN THE INTEREST OF J.T.G., O.M.G., M.T.G., J.R.G., D.N.G., L.G., AND M.G., CHILDREN

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2008-09997J**

## M E M O R A N D U M   O P I N I O N

In this appeal from an order terminating the parental rights of a mother to her seven children, Tonya[1] raises five issues: (1) the evidence is legally and factually insufficient to support termination of parental rights to the younger three children under Family Code section 161.001(1)(N); (2) the evidence was legally and factually insufficient to support termination of parental rights to the younger three children under section 161.001(1)(O); (3) the evidence is legally and factually insufficient to support the

---

[1] To protect the privacy of the parties in this case, we identify the children by their initials, and we identify the parents, relatives, and alleged biological parents by fictitious names. *See* Tex. R. App. P. 9.8(b)(2).

finding that termination of Tonya's parental rights was in the children's best interest; (4) the evidence was legally and factually insufficient to support the appointment of the Department of Family and Protective Services (DFPS or the agency) and the father of three of the children as sole managing conservators of the children; and (5) whether the trial court erred by changing the names of J.T.G., M.T.G., and J.R.G. For the reasons explained below, we affirm.

I

Tonya was born in 1977 and left school at age fourteen or fifteen. She lived for a time with a boyfriend, but had no children with him. Sometime thereafter, Tonya met James and became pregnant. She had her first child, J.T.G., on April 28, 1998. During this pregnancy, Tonya's mother died of a heart attack. Tonya was then about twenty years old.

Tonya had her second child, O.M.G., on August 27, 1999, after she began a relationship with Isaiah. When O.M.G. was an infant, Isaiah put her in a car without a car seat. Tonya ran after him and jumped in the car. Isaiah lost control of the car and was killed, and Tonya and O.M.G. were injured. After Tonya got out of the hospital, she tried living with her sister, Donna, but Donna threw her out.

Tonya rekindled her relationship with James and had two more children with him, M.T.G. and J.R.G., who were born on January 26, 2001, and July 24, 2002, respectively. Although Tonya thought James was a good father, she ended the relationship because she no longer wanted to be with him. In 2004, Tonya began a relationship with Kendrick. Tonya then had three children with Kendrick: D.G., born November 30, 2004; L.G., born February 25, 2007; and M.G., born August 13, 2008.

About two months after the birth of M.G., on October 29, 2008, DFPS received a referral of neglectful supervision involving Tonya's seven children. The referral reflected that Tonya was incarcerated for sexual abuse of a minor and her boyfriend, Kendrick, was the only caregiver for the children. The report included an allegation that Kendrick

2

abused drugs on a daily basis and that his drug use could impair his ability to care for the children. The referral also contained an allegation that Kendrick "blew smoke from crack smoke" in the face of M.G. and L.G.

The day after DFPS received the referral, a CPS caseworker went to Tonya and Kendrick's residence. Kendrick was drinking beer, smoking a cigarette, and listening to music when the caseworker arrived, and he continued to drink beer during the interview. Kendrick told the representative that the children were with their maternal aunt, Donna. Kendrick stated he was the father of the three youngest children, but considered all the children to be his own. Kendrick also stated that he had been keeping all the kids by himself for about two to three weeks and that he and Tonya decided to prepare a power of attorney for all the children to go to the aunt after Tonya "figured CPS would be coming." Kendrick said that Tonya's lawyer said a boy claimed Tonya had sex with him while she was pregnant with her last child, and when she was indicted she decided to move the children to her sister's home.

Kendrick admitted that he had a criminal history and that he had been arrested for a drug charge. His criminal history includes arrests for driving under the influence of liquor, two dismissed charges for theft of property, and one probation-revocation charge for possession of a controlled substance. Kendrick was convicted of driving while his license was suspended and assault that caused bodily injury to a family member. Tonya's criminal history includes one conviction for failing to identify a fugitive from justice. The pending charge against her was for aggravated sexual assault of a child under fourteen years old.

Tonya was interviewed in jail by the DFPS caseworker on October 31, 2008. She stated she was "slow" and this was her only mental-health issue. She said she had been treated for depression but stopped taking the medication in 2000. During the conversation she referred to O.M.G.'s father, but was not sure of his name and appeared confused and disoriented. Tonya stated that she was arrested because she was going out with a fifteen-year-old boy who lived in the neighborhood, and her relative made the story up. Tonya

denied the allegation of sexual abuse, however, she also explained that the incident with the boy "happened while she was pregnant and it happened three times or so."

Tonya stated that she planned to sign over a power of attorney to her sister until she gets out of jail. A special investigator for the agency verified the terms of Tonya's bond and determined that it stipulated she could not have contact with the minor she was accused of assaulting. Tonya agreed to place her children with her sister and signed a safety plan agreeing to no unsupervised contact with her children.

On December 12, 2008, Donna informed the CPS caseworker that Tonya bonded out of jail and took the three youngest children, M.G., L.G., and D.G. without her permission while Donna's nineteen-year-old daughter was babysitting them. According to Donna's daughter, Tonya did not recognize M.G. and did not have car seats for the three children. The caseworker attempted to have Tonya return the children, and a great aunt who had helped Tonya bond out gave conflicting stories about her whereabouts. Eventually the children were returned to Donna's home.

Because of Tonya's violation of the safety plan, her mental-health issues, and the pending charges, DFPS sought an order to place the children in its legal conservatorship.[2] DFPS filed its original petition for protection of a child, for conservatorship, and for termination in a suit affecting the parent-child relationship on December 15, 2008. After DFPS filed suit, the trial court ordered that DFPS be named the children's temporary managing conservator.

On January 8, 2009, an adversary hearing was held at which Tonya, James, and Kendrick were present. At the hearing, the attorney for DFPS represented that an agreement had been reached in which the DFPS would have temporary managing conservatorship and the parents would participate in services. All seven of the children were placed with Donna, and were doing well. After the hearing, the trial court signed an order reaffirming its original order appointing DFPS as the children's temporary managing conservator. In the order, the court also required Tonya and the children's

---

[2] The foregoing facts are drawn from the affidavit supporting DFPS's original petition.

4

fathers to comply with each requirement set out in any original or amended service plan during the pendency of the suit. Other orders were signed that day directing James and Kendrick to submit to genetic testing to determine parentage, and for Tonya, James, and Kendrick to submit to drug tests. Kendrick submitted to a drug test that same day, and the results indicated he tested positive for cocaine. Tonya tested negative, but James tested positive for marijuana.

During a Children's Crisis Care Center (4C's) interview conducted a few days later, on January 12, 2009, Tonya disputed the claim of neglectful supervision and stated that the allegation of a sexual relationship with a minor was completely false. She believed her brother began the rumor. Tonya also believed that Kendrick was an appropriate caretaker for her children while she was incarcerated, but she agreed to let her children stay with her sister, Donna. Tonya denied that Kendrick had a substance-abuse problem.

Tonya told the 4C's interviewer that she was temporarily living with an aunt and the aunt's husband and that Kendrick was living with his parents, but their separation was temporary. Before this, Tonya and Kendrick lived for a year in a house with the seven children. Tonya stated that she was never employed and had no plans to work outside the home. She received $630 per month in social security benefits and stated it was because she was "a slow learner." Tonya stated that she did not use illegal drugs or alcohol and that Kendrick drank alcohol but was not an alcoholic.

Kendrick and James also participated in 4C's interviews. During Kendrick's interview, he disputed the allegations of neglectful supervision of the children and stated that he did not believe Tonya was involved in sexual abuse of a child. He admitted he used cocaine after DPFS removed the children and he claimed he did so because he was upset. He also admitted he drank about four to five beers every day but did not think it interfered with his work or care of the children. He admitted that he was drinking during the DFPS interview but did not feel that was a problem.

5

During James's interview, James stated that he did not know if the allegations of sexual abuse against Tonya were true, but he has never had any concerns about sexual abuse with his children. He explained that he had not been directly involved with the children for several years because he was incarcerated from 2003 until October 2007. When he returned, Tonya was involved with Kendrick. James stated that he was currently assisting Donna with the care of the children, and he would like to have all three of his children returned to his care. He would like custody of O.M.G. as well, as he has always viewed her as his child. James also stated that he had stable employment. He acknowledged that he was not providing regular child support, but he bought things for his children at Tonya's request.

On February 10, 2009, the trial court conducted a status hearing, for which Tonya, James, and Kendrick were present. The children's caseworker, Diedra Simmons, testified that she had prepared family service plans for the parents and had gone over them with the parents. She further testified that Tonya signed her service plan and she believed that Tonya understood it and understood what she needed to do to obtain the return of her children. DFPS's goal for the children at this time was family reunification, with James's children being placed with him and the other four children placed with Tonya. Simmons stated that DFPS was asking Tonya to have a psychological exam, a drug and alcohol assessment, individual therapy, and parenting classes. Tonya was also being asked to remain drug-free, to maintain stable housing, and refrain from criminal activity. At this time, all of the children were with still with Tonya's sister, Donna. DFPS's counsel explained that, because of the criminal charge, Tonya was not allowed to visit the children.

Another family service plan was created for Tonya and filed with the trial court on March 5, 2009. The March 5 service plan, which reflected a permanency goal of "family reunification" by a target date of December 15, 2009, reflected that Tonya was to keep the caseworker informed of her current address and phone number, demonstrate that she is financially able to provide for her children, complete a drug and alcohol assessment,

6

participate in individual therapy, complete a psychological evaluation, and complete a parenting class.[3] That same day, the court signed an order requiring Tonya to complete all the items outlined in the service plan. Tonya was also ordered to complete a substance-abuse-treatment program, complete a psychological examination and follow its recommendations, participate in counseling, complete parenting classes, complete a drug and alcohol assessment, complete random drug tests, remain drug-free, refrain from criminal activity, and maintain stable housing and employment. By a separate order, the trial court approved and adopted the service plans filed with the court as if set out verbatim and advised that the parents' progress would be reviewed at subsequent hearings. The order also reflected the court's finding that Tonya reviewed and understood the service plan.

In a June 2009 status hearing, counsel for DFPS informed the trial court that because DFPS had not approved the home study for all of the children, the associate judge who had been hearing the case asked that the children be moved. J.T.G., M.T.G., and J.R.G. were then placed with James, O.M.G. remained with Donna, and D.N.G., L.G., and M.G. were placed in foster care. DFPS's attorney explained that while the agency was willing to consider Donna as a placement, it believed that all seven children in one home was "too much." DFPS's attorney also stated that James had tested positive for marijuana about a week earlier, and that James had previously tested positive for cocaine in January and for cocaine and marijuana in February. Despite the test results, DFPS and the children's attorney stated that they preferred that the children remain with James.[4] The trial court admonished James to refrain from using illegal drugs if he wanted to keep the children.

Another status hearing was held on February 4, 2010. Tonya and James attended, but Kendrick did not. At the hearing, DFPS's attorney represented that Kendrick had

---

[3] Although the plan filed with the court does not include Tonya's signature, a duplicate document was admitted into evidence that contained her signature.

[4] At the status hearing, DFPS expressed a desire that the three youngest children, who had been placed in foster care be returned to Donna, since James was now caring for three of them. Although the trial court signed an order to that effect, the record does not reflect that this was done; apparently, the three youngest children remained in foster care.

7

been established to be the father of the three youngest children. The attorney also stated that James's recent drug tests had been negative and Tonya's were always negative when she appeared in court. The caseworker, at that time Amanda Nolan, testified that James's three children remained in his home and were doing very well and DFPS's goal for these children was reunification with James. O.M.G. was living with Donna and was thriving, and the goal for her was relative adoption. The youngest three children were living in a foster home, and the goal for them was unrelated adoption. Nolan testified that she had not seen Tonya since an earlier court hearing in December, and Tonya had not completed any services. Nolan stated that she understood Tonya's charges were dismissed, and she acknowledged that Tonya had been acquitted and that Tonya gave her the paperwork in December. Nolan also stated that Tonya's attorney had informed her that Tonya now had housing and was no longer homeless. Although Nolan acknowledged there was no longer any restriction on Tonya's access to the children, DFPS still required that Tonya's contact with the children be supervised.

A Permanency Plan and Permanency Progress Report filed June 1, 2010,[5] less than two weeks before trial, reflected that Tonya had not started any of the services requested by the agency, nor had she provided proof of residence or proof of employment. According to the caseworker, Tonya stated that she was unable to start services because she was unemployed and had no residence. Kendrick similarly had not complied with the services asked of him and he stated he was unable to go to services because he was unemployed. Kendrick tested negative for drugs in August 2009, but failed to appear for a second test in September 2009. James provided the caseworker with pay stubs, a lease agreement, and contact information for his therapist. The caseworker confirmed James's attendance with the therapist.

Concerning the children, the progress report reflected that J.T.G., M.T.G, and J.R.G. were currently placed with their father, James; O.M.G. was placed with Donna;

---

[5] Permanency plans and permanency progress reports were also filed June 11, 2009; October 8, 2009; December 18, 2009; February 4, 2010; February 8, 2010; June 10, 2010; and August 31, 2010. Hearings were also held regularly.

and the three youngest children, D.N.G., L.G., and M.G., were in foster care. The caseworker visited with J.T.G., M.T.G., and J.R.G. at James's home monthly, noted no concerns, and reported that the children were thriving. Additionally, these children were doing exceptionally well in school, were all involved in soccer, and attended therapy at the local youth center. O.M.G. was not involved in any after-school activities and was failing math, but was receiving after-school tutorials. The three youngest children were placed in a foster home where the caregiver was able to provide for their basic needs.

At the trial, which commenced June 10, 2010, Tonya's March 5 family service plan, the June 1 permanency report, and the 4C's report were admitted as exhibits. The trial court also took judicial notice of all the temporary orders in the case, including the status orders and other orders instructing Tonya to perform the tasks of the family service plans.

The first witness to testify was Jaclyn Young, the caseworker currently assigned to the children. She was the third worker assigned to the case, and she had been assigned in late April, less than two months earlier.[6] Thus, Young's personal knowledge of the case was very limited and her testimony was largely based on her review of the case file and information given to her by the agency.

Young stated that the children came into care when Tonya was indicted for sexual abuse of a fourteen-year-old child. When Tonya was arrested, DFPS voluntarily placed the children with relatives under a safety plan. But Tonya violated the safety plan by picking up the children. She testified that Tonya had been living with the children's father, who was drinking and using drugs. Consequently, DFPS sought temporary managing conservatorship of the children.

When the children came into care, the youngest child was four months old and the next two youngest children were about two and four years old. After the children were ordered into the conservatorship of DFPS, they were placed with relatives and the older

---

[6] The first worker, Diedra Simmons, and the second worker, Amanda Nolan, no longer worked for DFPS. However, Katera Butler, the program director, had been on the case the entire time it was pending.

children went to James at some point. Tonya was denied visitation because of her criminal case. Young acknowledged that Tonya was later acquitted of the sexual-abuse charge, which was expunged from her records. After that, she testified, DFPS was willing to allow Tonya to visit her children. But Tonya did not contact DFPS to request visits, and she did not work on the tasks and services she was to complete.

Young acknowledged that Tonya did submit to the 4C's evaluation in January 2009. The evaluation included a recommendation that Tonya submit to a psychological evaluation to determine her level of functioning, but even though DFPS had made a referral with a service provider,[7] Tonya did not submit to a psychological evaluation. Consequently, DFPS has no way of knowing what Tonya's limitations might be.

Young also testified that Tonya did not attend any services other than the 4C's interview. She also stated that Tonya became homeless and never showed Young proof of a lease or verifiable income. Young was aware, however, that Tonya received disability income. Young also acknowledged that she only recently learned from Tonya's attorney that Tonya had obtained a residence. She had no other information that Tonya had any residence after her acquittal. Young had no record of DFPS's attempts to contact her after her release from jail. Young also had no record of discussions concerning any of Tonya's service plans after her acquittal.

According to Young's records, Tonya did not visit the children at all and did not visit O.M.G. when she was at her aunt's house. Young later clarified her testimony, explaining that Tonya had visited her older children, but she had not visited the youngest three at all. Young stated that for the nearly year and half that the children were in care, Tonya made no offer to do anything for her children. Young also testified that she believed Tonya failed to maintain significant contact with her children.

Young testified that she believed it was in the best interest of the three youngest children that Tonya's parental rights be terminated. Young stated that DPFS's plan was to

_____

[7] Young testified that although she had seen the referral in her computer system, she did not have a copy of it in her file and could not recall the date the referral was made or the name of the service provider.

place D.J., L.G., and M.G. in a legal-risk home so they would be adopted, and she believed that was in their best interest. In Young's opinion, the children were very adoptable because they were so young. Young also did not think it would be in the children's best interest to keep them in CPS care and continue to move them around. Young explained that CPS did not have a family placement for the three youngest children at that time and so they were in foster care, and had been with their current foster placement since February. She stated they were doing better in their current placement (they had been in one other foster home previously) but it was not a permanent placement. The children had been with their aunt before they were placed in a foster home. No one had come forward with the name of a relative suitable to care for the three youngest children.

Young stated that the agency provided a court-ordered family service plan for Kendrick, but he did not come forward and participate in services. He also tested positive for high levels of cocaine at the beginning of the case. He visited the children on at least one occasion but did not maintain significant contact with the children even after his paternity had been established through DNA testing. Kendrick also did not show that he had a job or a lease and did not show that he stopped using cocaine. Young testified that she believed it was in the best interest of D.N.G., L.G., and M.G. that their father's parental rights be terminated.

Young testified that James was present at all the hearings in the case and participated in all of the services requested of him. Further, he maintained a stable home for his children and even for O.M.G., who was not his child, but who was a sibling of his children. Young stated that James allowed Tonya to visit the oldest children in a supervised setting. In response to a question from the court, DFPS's attorney interjected that Tonya's drug tests were always negative. James also interrupted Young's testimony to state that he had been letting Tonya see the children and the last time she visited them was about two months earlier. James also explained that he takes the children to see Tonya because she does not have transportation. James stated that things were going well

11

with O.M.G., who had just moved in with him, and she did not have special needs. Young also testified that O.M.G. was moved into James's home the week before and was doing very well. She stated that DFPS's request at that time was that the four oldest children, J.T.G., O.M.G., M.T.G., and J.R.G., be placed in the permanent managing conservatorship of James and that Tonya's parental rights as to these children not be terminated, but that she be named a possessory conservator with supervised visitation by James.

The judge recessed and continued the case after Young's testimony because she wanted to hear from other witnesses who had more personal knowledge of the case. The trial resumed August 31, 2010. As its second witness, DFPS called Katera Butler, the program director overseeing the conservatorship program to which Tonya's children were assigned. She testified that she had been reviewing the file all along and was familiar with what was going on in the case.

Butler testified that DFPS's goals for the children continued to be that James be given conservatorship of the older four children, and unrelated adoption for the younger three children. She explained that the younger three at one time had been placed with their aunt and the other four children, but the situation became unworkable. It was Butler who recommended to the trial court that the youngest three children not remain in that placement. She also approved O.M.G.'s placement with James.

Butler confirmed that the children came into DFPS care because Tonya had been charged with an offense and violated the safety plan. She also testified that the criminal charges against Tonya were dismissed, she was acquitted, and the charge was later expunged in September 2009. She understood that CPS did not learn of the acquittal until January 2010, but acknowledged it was possible that Tonya made the agency aware of the acquittal shortly after it happened.

Butler explained that in January 2009, after the children came into DFPS care, a family-group conference was held in which DFPS explained the services offered to the family and the goal for the case. Tonya participated in the conference and also signed a

12

service plan at that time. Butler testified that Tonya was told what services she needed to complete to get her children back. She acknowledged that visitation was not discussed at that time because it was a condition of Tonya's bond that she not have contact with her children. Butler stated that, after CPS learned of the acquittal, a formal visitation plan was not prepared, but Tonya was informed that she could visit. Butler explained that the agency wanted Tonya to contact it to set up visitation because the agency had been unable to contact her from September 2009 to January 2010, as she was homeless. In February 2010, the agency explained to Tonya that she could visit the children, but she did not set up visits or request that visitation be scheduled.

Butler testified that in March 2009, Tonya appeared in court for a hearing, and at that time the caseworker gave her information about the services she was asked to complete. Referrals were made for her to complete a psychological and substance-abuse assessment in February 2009 by Diedra Simmons, and again in April 2010 after Amanda Nolan got the case. Butler approved these referrals.[8] Tonya also participated in a permanency conference in May 2009, in which she went over the service plan and said that she could not participate because she was not working and had no transportation to get to the services. Tonya did not ask for visitation at that time. Butler also testified that when the services were set up the second time, Amanda Nolan told Tonya who to call and where to go, and that the provider was to contact Tonya. But, the agency did not hear anything from Tonya.

When Young got the case, she was able to contact Tonya in May 2010. At that time, the authorizations for service were still active, but Butler had no knowledge of whether Young talked to Tonya about the services. Butler testified that Tonya did not initiate or have any visits with the children until after the trial date in June. Young did set up a visitation schedule for her on the first and third Thursday of the month at the Murworth office, and the children were brought to the Murworth office on the scheduled

---

[8] On cross-examination, however, Butler stated that the first referral was sent in November 2009, but then repeated that it was made in February 2009. She also acknowledged that once the agency communicated to the provider that a service was authorized, it had no control over whether the provider contacted Tonya or Tonya contacted them. Butler also stated that she did not have the exact date the referrals were made.

13

days, but Tonya attended only one visit in July. Tonya's reason for not attending those visits was that she had no money for transportation, and she never gave any other excuse. Butler explained that the agency made an accommodation for Tonya to see her youngest three children by changing the location to the Murworth office because that office was on several bus lines. She acknowledged that the agency made no offer to supply bus tokens or transportation for Tonya, even though the cost of the services offered would be much greater than the cost of bus tokens, and she believed the agency's accommodation was sufficient.

Butler testified that the agency requested that Tonya complete a psychological evaluation, a substance-abuse assessment, random urinalysis, and parenting classes, and that she provide stable housing and verifiable income. Tonya did not obtain a psychological evaluation, attend parenting classes or therapy, or perform any random urinalyses for the agency.[9] Tonya also failed to provide information that she was working, however, and Butler understood that she was receiving social-security payments of roughly $637. Butler stated that Tonya did provide the address of her most recent residence, but Butler did not know the amount Tonya paid for rent. Before that, Butler estimated, Tonya lacked stable housing for about five months. Butler acknowledged that the agency had not gone to Tonya's new residence, but her lack of a stable home environment throughout the pendency of the case was a concern. Consequently, the agency was concerned that Tonya would not be able to provide a safe and stable home environment for the children. Butler summarized the agency's primary concerns as Tonya's "mental stability and her capacity to be able to parent these children and her instability in the home environment."

Butler stated that the agency has made efforts for Tonya to obtain the return of her three youngest children through a family service plan, but Tonya has only seen the children twice during the pendency of this case, and has not maintained significant

---

[9] Butler also testified that although Tonya completed the 4C's evaluation, she did not follow its similar recommendations for services. Butler acknowledged that Tonya had been tested for drugs at least two times when she came to court and the tests were always negative.

contact. In Butler's opinion, Tonya's failure to maintain contact with the children was endangering to them. Butler stated that it was important that very young children bond with their mother, and she did not believe that Tonya's lack of means to get to a visit was an acceptable excuse for a mother.

Butler also testified that Kendrick, the children's father, tested positive for cocaine at the beginning of the case, and he did not complete most of the services outlined on his family service plan even though referrals were made for him and explained to him. He was visiting the children "inconsistently" until September 2009, but he stopped coming and the agency has had no contact with him since then. The last information the agency had on Kendrick was that he was not working and he was living with his parents. Kendrick has not requested that the agency investigate his home as a possible placement for D.N.G., L.G., and M.G., and he has not maintained significant contact with his children. Kendrick has never explained why he failed to complete the services, he has not paid any child support, or brought clothes or shoes to the children. Likewise, Tonya never provided any clothing or financial assistance for the children when they were staying with her sister, Donna, and Tonya has not brought anything for the children on the occasions that she visits them.

Butler agreed that the children were very young when they came into DFPS's care, and because Tonya has not seen them they do not recognize her and she did not know them. Butler stated that if the court terminated Tonya's parental rights to the youngest three children, a legal-risk broadcast would be able to be done, and the children would have a good chance of being adopted because they were so young.

Consequently, Butler testified that the agency was requesting that Tonya's and Kendrick's parental rights to D.N.G., L.G., and M.G. be terminated, that James be named sole managing conservator for J.T.G., O.M.G., M.T.G., and J.R.G., and that Tonya be named possessory conservator with supervised visitation by James. Butler testified that this was in the best interest of the children.

15

The last witness to testify was Tonya. She testified that she receives income of $674 per month, and her rent is $500. Her remaining money is used for "food and stuff," and that is why she has no money to travel to visit her children. Tonya testified that if she had the money, she would have traveled to see the children more often. She testified that she loves her children, and she has had good visits with them when James brings them to her. The only reason she has not visited has been an "economic problem." Tonya also testified that no one has offered to assist her with transportation. She did not want the court to terminate her rights to any of her children.

Tonya stated that she brought a copy of her acquittal to the court and gave it to a man who worked there the day after she received it in September 2009. Tonya acknowledged that she was homeless at the time. She did not make arrangements for the agency to contact her because she did not have a phone, but stated that she got a phone about two months later. Tonya testified that she was homeless for about a year, but she now has a home and pays the rent with her social-security check. She sometimes walks to get to court. When asked whether she had any way to pay for a bus ticket or token to go to the Murworth office to see her children, she said, "Sometime[s], but not all of the time, no."

At the conclusion of the trial and after considering the parties' closing arguments, the trial court granted the relief requested by DFPS. The trial court signed an order on September 21, 2010, declaring James the father of J.T.G., M.T.G., and J.R.G., and Kendrick the father of D.N.G., L.G., and M.G. The court expressly made no finding as to Isaiah. The trial court found clear and convincing evidence supporting termination of the parent-child relationship between Tonya and D.N.G., L.G., and M.G., based on Family Code sections 161.001(N) and 161.001(O), and found that termination was in the best interest of these children. The trial court also ordered the parent-child relationship between Kendrick and D.N.G., L.G., and M.G. terminated.[10] DFPS was appointed sole managing conservator of these children. The trial court also appointed James as sole

---

[10] Kendrick has not appealed the termination of his parental rights.

16

managing conservator of J.T.G., O.M.G., M.T.G., and J.R.G. and Tonya as possessory conservator of these children. The court also ordered the last names of James's children, J.T.G., M.T.G., and J.R.G. to be changed to James's last name. This appeal followed.

II

A

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). To terminate a parent-child relationship, a trial court must find by clear and convincing evidence that (1) termination is in the best interest of the child, and (2) the parent committed one or more of the acts specifically named in Family Code section 161.001. Tex. Fam. Code § 161.001. "Clear and convincing evidence" is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007. Only one ground under section 161.001 is necessary to support a judgment in a parental-rights-termination case when there is also a finding that termination is in the child's best interest. *See* Tex. Fam. Code § 161.001; *In re A.V.,* 113 S.W.3d 355, 362 (Tex. 2003).

When conducting a legal- and factual-sufficiency review in a parental-rights-termination case, we must determine whether the trial court abused its discretion by finding that, based on the evidence, the fact finder reasonably could have formed a firm belief or conviction that its findings were true. *See In re C.H.,* 89 S.W.3d 17, 25 (Tex. 2002); *In re J.F.C.,* 96 S.W.3d 256, 265–66 (Tex. 2002). In reviewing legal sufficiency of the evidence, we examine all of the evidence in the light most favorable to the fact finder's findings. *In re J.F.C.,* 96 S.W.3d at 266. In reviewing factual sufficiency, we examine all of the evidence giving due consideration to evidence that the fact finder could have reasonably found to be clear and convincing. *Id.* We also consider whether disputed evidence is such that a reasonable fact finder could not have resolved that

17

disputed evidence in favor of its finding. *Id.* If the disputed evidence that a reasonable fact finder could not have credited in favor of its finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

Under subsections (N) and (O), termination is warranted if the trial court finds by clear and convincing evidence that the parent has

> (N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months, and:
>
>> (i) the department or authorized agency has made reasonable efforts to return the child to the parent;
>>
>> (ii) the parent has not regularly visited or maintained significant contact with the child; and
>>
>> (iii) the parent has demonstrated an inability to provide the child with a safe environment; [or]
>
> (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

Tex. Fam. Code §§ 161.001(1)(N) & (O).

B

In her first issue, Tonya contends that the evidence is legally and factually insufficient to support the termination of Tonya's parental rights to her youngest three children under Family Code section 161.001(N). Although Tonya does not challenge the requirement that DFPS has been the children's managing conservator for at least six months, she challenges the evidence supporting each of the remaining three elements.

First, Tonya contends the evidence is legally and factually insufficient to support a finding that DFPS has made reasonable efforts to return the children to her. She argues

18

that DFPS assumed she was guilty of the criminal charges, and so never seriously considered returning the children to her. The record shows that the family service plan of March 5, 2009, admitted at trial with Tonya's signature, reflects a goal of family reunification.[11] Although DFPS prepared the service plans in an attempt to assist Tonya, she did not complete the requested services. Tonya acknowledges that proof of the preparation and administration of a service plan for the parent constitutes evidence that the State made reasonable efforts to return the child to the parent. *See, e.g., In re K.M.B.,* 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.); *In re S.S.,* No. 11-05-00083-CV, 2006 WL 1285125, at *2–3 (Tex. App.—Eastland May 11, 2006, no pet.) (mem. op.).

Tonya nevertheless claims that "there is no credible evidence that the agency made any reasonable attempt to administer the plan" because there was nothing in the case file at trial to prove service authorizations were sent. Tonya points to Butler's trial testimony, but the testimony Tonya relies on does not show, as Tonya claims, that referrals were not sent out; on the contrary, it shows that Butler acknowledged that the referral information may only be in the DFPS's computer system rather than in the case file binder, but she testified affirmatively that she "knew she reviewed it." The trial court was entitled to credit this testimony. Tonya also suggests that no services were administered because Butler stated that after Young was assigned the case she made no attempt to set up services or talk with the mother about participating in services. But a review of the evidence in context reveals that Tonya was "twice" given information about the referrals and where she needed to go: once in February 2009, and again when Nolan got the case in April 2010.

---

[11] Tonya asserts that none of the five Permanency Plan and Permanency Progress Reports in the record reflect a goal of reuniting the children with her, and none include the fact that she was acquitted of the charges against her. According to Tonya, given that the charges were the sole reason she was precluded from seeing her children for several months at the beginning of the case and that, at the latest, DFPS knew the charges were no longer pending against her by October 8, 2009, the failure to include the fact of her acquittal is evidence that DFPS did not make reasonable attempts to return the children to her. This argument ignores the totality of the record, which shows that DFPS did make efforts to help Tonya get her children back, but Tonya failed to keep in contact with DFPS, participate in the services requested of her, or provide any evidence of a stable home or employment.

Tonya also claims that after she made DFPS aware of her financial problems, DFPS's only accommodation was to change the location of her services to a place that was easier to reach by bus rather than give her bus tokens or otherwise provide transportation for her. But Tonya cites no authority requiring DFPS to provide transportation for her. *See In re M.V.G.*, No. 10-09-00054-CV, 2010 WL 730366, at *5 (Tex. App.—Waco Mar. 3, 2010, no pet.) (mem. op.) (noting that relevant question was whether DFPS made reasonable efforts, not ideal efforts). Even if we assume DFPS could have offered additional transportation assistance to Tonya, on this record, there is little evidence that Tonya would have taken advantage of it. It is undisputed that Tonya did not complete the court-ordered services requested of her to obtain the return of her children, including the orders that she maintain stable housing and employment, and even though she was receiving disability payments, there was no evidence she was unable to be employed. Further, although Tonya complains DFPS did not make reasonable efforts to accommodate her, DFPS representatives testified that they were unable to contact her because she was homeless, and by Tonya's own admission, she was homeless for about a year. Also, she made no efforts to contact DFPS, even though she testified she got a phone two months after she was acquitted. Additionally, Tonya admitted that she "sometimes" has a way to pay for a bus ticket to go to the Murworth office, and so the trial court could have had reason to question why during the "sometimes" she did not go to the required services.

Next, Tonya contends her lack of contact with her children was not willful or intentional. Tonya argues that initially she was prohibited by court order from visiting the children, and after she was acquitted DFPS did not tell her until February 2010 that she could have visits with the children; as a result, she was prohibited from visiting the children for the first fifteen months of the case. After that, she maintains that she was precluded from seeing the younger children due to poverty, which was corroborated by James, who stated that he took the older children to visit her because she had no transportation.

The evidence shows that Tonya only visited her three youngest children twice during the year and a half they were in DFPS care. And, although DFPS acknowledges that she was prevented from seeing the children for a time, it points out that there is no evidence that in the interim Tonya attempted to maintain contact in other ways, such as through letters, birthday cards, or small gifts. Further, the evidence is undisputed that while Tonya's children were with her sister she made no offer to do anything for them. There was also testimony from Butler that although two of Tonya's older children had recent birthdays, Tonya did not try to contact them through either the agency or James. Moreover, Tonya did not testify that she was impoverished; she stated only that she had an "economic problem." The trial court could have found Tonya's excuse unpersuasive given that she signed a service plan requiring her to demonstrate her ability to provide for her children financially, and she also had been ordered to maintain stable employment, but Tonya offered no explanation for her failure to obtain or maintain employment.

Finally, Tonya contends there is no credible evidence regarding her ability to provide a safe environment for the children. Specifically, Tonya argues that there is no mention of the children's home environment at the beginning of the case and no evidence concerning her residence at the time of trial. But the trial court heard testimony that Tonya had been homeless, never provided proof of a lease, and DFPS had been unable to contact her from September 2009 until January 2010. Tonya herself admitted that she had been homeless for about a year, and Butler stated that lack of a stable home environment throughout the pendency of the case was a concern to DFPS. In addition to Tonya's lengthy history of homelessness, the trial court also could have taken into consideration that Tonya and her children were living with Kendrick, an admitted cocaine abuser, when Tonya was first incarcerated and DFPS became involved, and that Tonya violated an agreed safety plan by visiting the children while she was out on bond and leaving with them in a car with no car seats. *See White v. Tex. Dep't of Family & Protective Servs.*, No. 01-04-00221-CV, 2005 WL 174546, at *6 (Tex. App.—Houston [1st Dist.] Jan. 27, 2005, no pet.) (mem. op.) (holding that jury could have concluded appellants were unable

21

to provide a safe environment for their children when they moved frequently, the caseworker was unable to contact appellants and was only able to approximate where they lived at various times, and another person who lived with appellants testified that he had been arrested for making terroristic threats).

On this record, Tonya's history of a failure to maintain stable housing, her poor judgment concerning the children's welfare, her failure to complete her court-ordered services to obtain the return of her children, and her failure to regularly visit or provide any support for her three youngest children is sufficient to enable a reasonable fact finder to form a firm belief or conviction that termination of Tonya's parental right to the youngest three children D.N.G., L.G., and M.G., is warranted under subsection (N). We therefore overrule Tonya's first issue.

C

Alternatively, we conclude that the evidence is also legally and factually sufficient to support the termination of Tonya's parental rights to the youngest three children, D.N.G., L.G., and M.G., under section 161.001(1)(O). In her second issue, Tonya does not dispute that she failed to comply with court-ordered actions necessary for her to obtain the return of the children or that the children had been in the conservatorship of DFPS for at least nine months. Instead, Tonya argues there is no evidence that that DFPS was named conservator due to abuse or neglect of the children. *See* Tex. Fam. Code § 161.001(1)(O).

According to Tonya, the affidavit supporting DFPS's original petition contains no allegations that her children were abused or neglected by her or anyone else. Further, the fact that Kendrick was drinking a beer when the DFPS investigator came to his home at the beginning of the case is no evidence of abuse or neglect of any child because none of the children were home at the time, and there was no evidence Kendrick was intoxicated. In any event, the children had already been placed in Donna's care, and the record reflects that Donna's home was a safe and appropriate environment for the children.

22

Tonya also contends she did not violate any safety plan by picking up her children after she was released from jail because the evidence shows the safety plan expired on December 1, 2008, and she picked up the children on December 12, 2008. Further, the evidence shows that Tonya was with a relative when she picked up the children and there was no evidence that she was ever unsupervised during the short time she had the children. Tonya also asserts that the record reflects that the children were returned unharmed, and there is no evidence that her action in removing the children from the aunt exposed the children to any risk of abuse or neglect, nor is there evidence that she had any mental condition that resulted in abuse or neglect of any of her children. Moreover, Tonya asserts that the only substantive reason DPFS gave for being named managing conservator of the children was that Tonya was charged with a crime against a minor (a charge of which she was acquitted) and she was prohibited by court order from being around her children, but this reason has nothing to do with abuse or neglect.

Courts, including this court, have held that removal of the child as a result of "abuse or neglect" is a required element of proof for termination under subsection 161.001(O). *See, e.g., In re S.N.*, 287 S.W.3d 183, 189–90 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *In re A.A.A.*, 265 S.W.3d 507, 515 (Tex. App.—Houston [1st Dist.] 2008, pet. denied); *In re S.A.P.*, 169 S.W.3d 685, 705–06 (Tex. App.—Waco 2005, no pet.). Exactly what constitutes "abuse or neglect" is not defined in the statute or by the case law and must be determined on a case-by-case basis. *In re M.G.*, No. 14-09-00136-CV, 2009 WL 3818856, at *8 (Tex. App.—Houston [14th Dist.] Nov. 17, 2009, no pet.) (citing *In re A.A.A.*, 265 S.W.3d at 515).

Here, the evidence shows that when the children were removed and the trial court ordered DFPS named the children's temporary managing conservator, Tonya was under indictment for sexual assault of a child. Although Tonya denied sexually abusing the child and several months later she was acquitted of this charge, the evidence at the time of the removal, as reflected in the caseworker's affidavit attached to DFPS's original petition, supports the court's finding that Tonya committed inappropriate acts that were

23

neglectful to the welfare of the children warranting removal under Chapter 262 for abuse or neglect.

It is undisputed that DFPS became involved with the children following a report of neglectful supervision. And, as provided under Family Code section 262.107, the trial court signed an order granting DFPS emergency temporary managing conservatorship of the children based on its finding that there was a continuing danger to the physical health or safety of the children if they were returned to the parent. *See* Tex. Fam. Code § 262.107. The court subsequently had an adversary hearing, as required by section 262.201 of the Family Code, and made the requisite findings for placement of the children in DPFS's temporary managing conservatorship under Chapter 262 of the Family Code. *See* Tex. Fam. Code § 262.201.

Further, according to the caseworker's affidavit, when Tonya was incarcerated, the children were left with her boyfriend, Kendrick, who was using drugs "on a daily basis" and reportedly his drug use "could impair his ability to care for the children." Kendrick admitted to his illegal drug use and it was confirmed by a drug test that was positive for cocaine shortly after the children's removal. And even though the children had been placed with Donna by the time the caseworker arrived to investigate the report, Kendrick told the caseworker that he had been taking care of the children by himself for two to three weeks. Moreover, DFPS representatives testified at trial that when Tonya got out of jail, she violated the safety plan she had agreed to by taking her three youngest children from her sister's home. Tonya did not dispute these facts when she testified at trial and no document or other testimony was admitted to dispute them.

Tonya contends, however, that there is proof she did not violate the safety plan because it was limited to the time period of October 31, 2008, until December 1, 2008, and she did not pick up the children until after it expired. Tonya's only support for this contention is a discussion at trial by DFPS's attorney about a document the attorney held in her hand, which she referred to as a safety plan signed by the mother on October 31,

24

2008. Although DFPS's lawyer made a comment that "It's 10/31 to 12/1/08" in response to the court's comment, "It's from the beginning to –," the comment was not sworn testimony by a witness, was not explained, and the document was never admitted into evidence. Thus, on this record, the unsworn, unexplained comment of DFPS's attorney does not compel a finding that Tonya did not, in fact, violate the supervised visitation requirement, particularly when the record contains undisputed testimony to the contrary.

In any event, the caseworker's affidavit also reflects that when Tonya took her children, it was reported that she did not recognize her baby daughter, M.G., and did not have car seats to transport her three young children, then ages four, two, and four months old. Although Tonya argues that she was not alone when she took the children and she returned them "unharmed," the evidence of Tonya's unwise actions after she was released on bond, in addition to cohabiting with and leaving her seven children with a cocaine abuser for some time before arranging for her sister to take them, also supports a finding that the children were removed for abuse or neglect.

Tonya also argues that the parent-child relationship should not be terminated merely because the parent has not been able to afford to get to services or visits and did not complete a family service plan. Under subsection (O), however, there is no provision for an excuse. *See In re M.C.G.,* 329 S.W.3d 674, 675–76 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *In re C.M.C.,* 273 S.W.3d 862, 875 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *see also In re T.N.F.,* 205 S.W.3d 625, 630–31 (Tex. App.—Waco 2006, pet. denied) (explaining that parents must comply with every requirement of the court order and that subsection (O) does not allow for consideration of excuses for noncompliance); *Wilson v. State,* 116 S.W.3d 923, 929 (Tex. App.—Dallas 2003, no pet.) ("Wilson's economic argument does not create a factual dispute as to her compliance: it is, instead, in the nature of an excuse for her failure to comply."). And the evidence conclusively demonstrates that Tonya failed to complete all of her court-ordered services and did not maintain any regular or significant contact with her three youngest children.

25

Finally, Tonya argues that findings at the adversary hearing are insufficient to support the abuse or neglect element because the statute requires clear and convincing evidence of each element of a specific ground for termination be presented at trial. However, on the first day of the trial, the court took judicial notice of its prior orders in the case at DFPS's request and without objection. In this circumstance, the trial court was entitled to take judicial notice of its own orders. *See In re R.W.*, No. 01-11-00023-CV, 2011 WL 2436541, at *7 (Tex. App.—Houston [1st Dist.] June 16, 2011, no pet.) (mem. op.); *In re H.M.P.*, No. 13-08-00643-CV, 2010 WL 40124, at *12 (Tex. App.—Corpus Christi Jan. 7, 2010, no pet.) (mem. op.). Tonya also argues that it is inappropriate for the court to take judicial notice of the affidavit supporting DFPS's original petition. *See* Tex. R. Evid. 201. Other courts have considered the affidavits attached to DFPS's petitions when determining whether the evidence of abuse or neglect is sufficient to uphold the trial courts' findings. *See In re A.A.A.*, 265 S.W.3d at 516; *In re M.B.*, No. 07-04-0334-CV, 2004 WL 2867544, at *2 (Tex. App.—Amarillo Dec. 14, 2004, no pet). We need not decide this issue, however, because the substance of the affidavit supporting the original action was included in the 4C's report admitted into evidence at trial, and Tonya does not argue that the trial court abused its discretion in admitting the 4C's report. *See In re S.N.*, 287 S.W.3d at 190 n.2.

Accordingly, based on the undisputed facts known at the time of the removal presented in the caseworker's affidavit, the trial judge had a sufficient basis to conclude that removal of the children was warranted because Tonya's inappropriate and unwise actions were neglectful to the welfare and safety of her children. We conclude that this evidence is legally and factually sufficient to enable a reasonable fact finder to form a firm belief or conviction that Tonya's children were removed under Chapter 262 for abuse or neglect. We therefore overrule Tonya's second issue.

III

A

A statutory act or omission under section 161.001(1) must be coupled with a finding that termination of the parent-child relationship is in the best interest of the child. *See Yonko v. Dep't of Family & Protective Servs.*, 196 S.W.3d 236, 242 (Tex. App.—Houston [1st Dist.] 2006, no pet.). There is a strong presumption that the best interest of the child is served by keeping the child with its natural parent, and the burden is on the department to rebut that presumption. *In re S.M.L.*, 171 S.W.3d at 480; *In re U.P.*, 105 S.W.3d at 230.

In reviewing the sufficiency of the evidence to support the second prong, a court examines several factors, including (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re S.M.L.*, 171 S.W.3d at 480; *In re U.P.*, 105 S.W.3d at 230. This list is not exhaustive, nor is evidence required on all nine factors to support a finding terminating a parent's rights. *Holley*, 544 S.W.2d at 372; *In re U.P.*, 105 S.W.3d at 230.

Although there is a strong presumption that it is in the child's best interest to allow the natural parent to retain custody, when confronted with evidence to the contrary, that presumption disappears. *In re A.I.G.,* 135 S.W.3d 687, 692 (Tex. App.—San Antonio 2003, no pet.). Evidence proving one or more of the statutory grounds for termination may be probative in determining that termination is in the best interest of the child. *In re*

27

*A.A.A.,* 265 S.W.3d at 516. With these considerations in mind, we review the evidence below.

B

In her third issue, Tonya contends the evidence is legally and factually insufficient to support the trial court's finding that termination of Tonya's parental rights was in the children's best interest. Tonya argues that DFPS introduced no evidence of some *Holley* factors, including the children's desires, any physical or emotional danger to the children, or programs available for the children. She also contends the evidence regarding the children's physical and emotional needs was so contradictory that no reasonable fact finder could form a firm opinion as to what these were. According to Tonya, DFPS's only real complaint about Tonya's acts and omissions was that she did not participate in services, and she conclusively demonstrated that the reason she did not participate was due to poverty.

The evidence showed that Tonya's three youngest children were very young at the time of trial, had not been in their mother's care for about a year and a half, and Tonya only visited them twice during the pendency of the case. Butler stated that since Tonya had not seen her kids, they did not recognize her and she did not know them. In evaluating the desires of a very young child, it is relevant to consider if the child has any conscious knowledge of the parent. *In re B.M.R.*, 84 S.W.3d 814, 820 (Tex. App.—Houston [1st Dist.] 2002, no pet.). Although Tonya testified that she loved her children, she did not dispute Butler's testimony. On these facts, the trial court could have determined that these children have little or no basis to believe Tonya loves them or for them to desire a parent-child relationship with her.

Concerning the children's physical and emotional needs, the trial court could have considered the undisputed evidence regarding Tonya's failure to maintain significant contact with these very young children as well as her failure to participate in the court-ordered services required to secure reunification with them. The trial court could have

28

concluded from this evidence that Tonya lacked the willingness or ability to provide for the children's futures, and that Tonya could not offer a permanent and stable solution for the three children at the time of trial. Although Tonya claimed she was living in a home at the time of trial, the trial court could have discounted this testimony, given that she admitted she had been homeless for about a year, and never showed proof of a lease. Moreover, Tonya did not explain why she could not overcome the "economic problem" that prevented her from seeing her children, even though she was directed to obtain stable employment and housing and to demonstrate an ability to provide for her children's needs. A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs. *See White*, 2005 WL 174546, at *8 (noting that the parents' ability to provide stability for their children's lives has been found to be of paramount importance in a child's emotional and physical well-being); *see also In re C.A.J.,* 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003, no pet.) (concluding evidence was sufficient to support best-interest finding for mother who admitted being unable to care for child, had no stable source of income or permanent home).

Concerning plans for the children, Tonya did not provide a plan for her children beyond stating that she loved them and did not want her rights terminated. Conversely, DFPS's plan was to find an adoptive home for the three youngest children. It was undisputed that the children were doing well in their foster home at the time of trial. Although the children were not yet in a placement with a family expressing an interest in adopting them, definitive plans by the agency for adoption cannot be the dispositive factor; "otherwise, determinations regarding best interest would regularly be subject to reversal on the sole ground that an adoptive family has yet to be located." *In re C.H.*, 89 S.W.3d at 28. Instead, the inquiry should be whether termination of the parent's rights would be in the children's best interest, even if the agency is unable to identify with precision the child's future home environment. *Id.* Here, it was undisputed that the children were very adoptable. This evidence, combined with the evidence supporting the trial court's finding that Tonya constructively abandoned her children under subsection

(N) and failed to complete any court-ordered services after the children had been removed for abuse or neglect under subsection (O), also supports a finding that DFPS's plan to terminate Tonya's parental rights so that an adoptive family could be found is in the children's best interest.

In light of all the evidence, the trial court could have formed a firm belief or conviction that termination of Tonya's parental rights to her three youngest children, D.N.G., L.G., and M.G., was in the children's best interest. We overrule Tonya's third issue.

IV

In her fourth issue, Tonya contends the evidence is legally and factually insufficient to support the appointment of James as sole managing conservator of the children and DFPS as sole managing conservator of the younger three children. Under this issue Tonya argues that no evidence was presented to overcome the parental presumption in favor of appointing her as sole managing conservator or both parents as joint managing conservators is in the children's best interest. *See* Tex. Fam. Code §§ 153.131(a), (b).[12] Specifically, Tonya argues that DFPS failed to introduce any evidence that appointing her as sole managing conservator of the youngest children would significantly impair their physical health or emotional development, and no evidence to overcome the presumption that she and James be appointed joint managing conservators

---

[12] Texas Family Code section 153.131 provides:

(a) Subject to the prohibition in Section 153.004, unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.

(b) It is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child. A finding of a history of family violence involving the parents of a child removes the presumption under this subsection.

Tex. Fam. Code §§ 153.131(a)–(b).

of the other children. Additionally, concerning O.M.G., Tonya also asserts the evidence was insufficient to overcome the parental presumption and support the appointment of James, a nonparent, over her as sole managing conservator of O.M.G., when there was no evidence that appointing her would significantly impair O.M.G.'s physical or emotional development and the record contains evidence of James's criminal history and recent illegal drug use. Tonya also contends there is insufficient evidence to support the order that her access to the four older children be supervised. Tonya contends that public policy encourages frequent contact between a parent and child, there is a rebuttable presumption that the standard possession order provides reasonable minimum possession of a child, and any restrictions on a parent's access to a child must be the minimum necessary to protect the child. *See* Tex. Fam. Code §§ 153.251(b), 153.252, 153.193.

As an initial matter, DFPS asserts that none of Tonya's contentions under this issue are properly before this court because she did not specifically present these issues in her statement of points as required under former Texas Family Code § 263.405(i), which was in effect at the time the trial court rendered its judgment. *See* Act effective Sept. 1, 2005, 79th Leg., R.S., ch. 176, § 1, 2005 Tex. Gen. Laws 332, 332, *repealed by* Act effective Sept. 1, 2011, 82nd Leg., R.S., ch. 75, §§ 5, 8, 2011 Tex. Sess. Law Serv. 348, 349. In points four and five of her statement of appellate points, Tonya states that there "is no evidence or the evidence was factually and legally insufficient to support the appointment of" DFPS as sole managing conservator of D.N.G., L.G., and M.G., and James as sole managing conservator of J.T.G., O.M.G., M.T.G., and J.R.G.

DFPS contends Tonya's stated points do not identify the specific factual finding in support of the appointments of DFPS and James that are being challenged, but in her brief, Tonya challenges whether the evidence overcomes the parental presumption to support appointing DFPS and James as managing conservators and appointing James over her as managing conservator of O.M.G. Tonya additionally challenges the trial court's findings that appointment of both parents as joint managing conservators would not be in the best interest of the children, that joint managing conservatorship would

31

result in serious physical or emotional harm to the children, and that supervised visitation by Tonya restricting her access to and possession of the children was necessary to protect the children.

We conclude that Tonya's statement of points do not encompass the added issues concerning joint managing conservatorship and possession or access restrictions. *See McPherson v. Hollyer*, No. 01-09-00619-CV, 2011 WL 1632163, at *7 (Tex. App.—Houston [1st Dist.] Apr. 28, 2011, no pet.) (mem. op.) (stating that appointment of a nonparent as a sole managing conservator is a distinct inquiry from restricting a parent's rights as a possessory conservator). Therefore, the issues concerning joint managing conservatorship and restricted access and possession are not preserved for review and we do not address them. *See Mann v. Dep't of Family & Protective Servs.*, No. 01-08-001004-CV, 2009 WL 2961396, at *15 (Tex. App.—Houston [1st Dist.] Sept. 17, 2009, no pet.). Assuming without deciding that Tonya's statement of points encompasses her challenges to the evidence supporting DFPS's and James's appointment as managing conservators, we conclude that these challenges should be overruled.

As the Texas Supreme Court explained in *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007), the proof in a decision to appoint a nonparent conservator differs from the decision to terminate parental rights. First, the decision to terminate parental rights requires proof of a specific enumerated act by the parent under one of the grounds of Family Code section 161.001(1) as well as proof that the decision to terminate is in the child's best interest. *Id.* But a court's decision to grant conservatorship of a child to a non-parent is more general and requires a finding that appointing the parent would not be in the child's best interest and would "significantly impair the child's physical health or emotional well-being." *Id*. Further, the quantum of proof for a parental-termination decision differs from the proof in a decision to appoint a nonparent conservator. *Id.* A parental-termination decision must be supported by clear and convincing evidence, but a finding that appointment of a parent as managing conservator would significantly impair the child's physical health or emotional development is governed by a preponderance

32

standard. *Id.* The Supreme Court describes the preponderance standard of proof as "more likely than not." *In re J.F.C.*, 96 S.W.3d at 265. This different standard of proof affects our appellate review. Conservatorship determinations "are subject to review only for abuse of discretion, and may be reversed only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d at 616 (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)).

Here, the evidence supporting parental termination, discussed above, also demonstrates that it is more likely than not that appointment of Tonya as a managing conservator of her children would result in serious physical or emotional harm to them, thus permitting the appointment of James as O.M.G.'s conservator and DFPS as the managing conservator of D.N.G., L.G., and M.G. Tonya claims the evidence shows that James was "still using illegal drugs more than six month after the agency was granted managing conservatorship of his children," but Tonya appears to rely on statements made in an earlier hearing that was not admitted at the final trial of the case. In assessing the evidence in support of a ruling from a final trial, testimony from prior hearings which are not admitted into evidence at the trial are not part of the evidence to consider in support of a trial court's ruling from the trial.[13] *See In re M.C.G.*, 329 S.W.3d at 675 (citing *In re C.L.*, 304 S.W.3d 512, 514–16 (Tex. App.—Waco 2009, no pet.)); *Garza v. State*, 996 S.W.2d 276, 280 (Tex. App.—Dallas 1999, pet. ref'd); *Escamilla v. Estate of Escamilla*, 921 S.W.2d 723, 726 (Tex. App.—Corpus Christi 1996, writ denied)). Therefore, this claim is unsupported.

In any event, the focus in deciding whether the parental presumption as to Tonya was rebutted would not be on James, but on Tonya, because the focal point of the statute is whether the appointment of Tonya as the children's managing conservator would significantly impair the children's physical health or emotional development. *See* Tex. Fam. Code § 153.131. Of the evidence already discussed, perhaps the most significant to this issue is Tonya's failure to maintain any sort of meaningful contact with her children,

---

[13] Although we included information from prior hearings in the factual background, our analysis of Tonya's issues is based upon the trial record and the judicially noticed orders.

even after her acquittal. As to the three youngest children, the evidence showed that Tonya failed to maintain significant contact while they were DFPS care and they do not know each other. Butler testified that she believed Tonya's failure to maintain significant contact with these children was "endangering" to them. As to Tonya's four oldest children, the evidence showed that Tonya saw them only when James brought them to her, she had not seen them in the two months before trial started, and she did not make any contact with two of the children on their birthdays. Under a preponderance-of-evidence standard, the evidence was sufficient to demonstrate that appointing Tonya as the children's conservator would significantly impair the children's physical health or emotional development. We therefore overrule Tonya's fourth issue.

V

In her fifth issue, Tonya contends the trial court erred by changing the surnames of J.T.G., M.T.G., and J.R.G. to James's last name because no evidence was presented at trial regarding the need for a name change, procedural requirements of Family Code chapter 45 were not followed, and there were no pleadings on file requesting that the names be changed. *See* Tex. R. Civ. P. 301; Tex. Fam. Code § 160.636. Therefore, according to Tonya, that portion of the trial court's order changing these children's names is void and should be reversed. Even if not void, Tonya asserts this portion of the judgment must still be reversed because no evidence was presented in support of the children's name change.

In response, DFPS asserts that unless this court reverses and remands Tonya's rights as a managing conservator of J.T.G., M.T.G., and J.R.G., Tonya has no authority to challenge the name changes. We agree with DFPS.

James was determined to be the biological father of J.T.G., M.T.G., and J.R.G., and the trial court appointed him their sole managing conservator. We have already determined that the evidence is legally and factually sufficient to support the trial court's judgment appointing James as these children's sole managing conservator. Consistent

34

with subchapter C of chapter 153 of the Family Code,[14] the trial court expressly granted James, as the parent with sole managing conservatorship of these children, certain "exclusive" rights, including the right to "represent the child in legal action and to make other decisions of substantial legal significance concerning the children." *See* Tex. Fam. Code § 153.132 (providing that unless limited by court order, a parent appointed sole managing conservator of a child has certain rights and duties as well as enumerated "exclusive rights" including the right to represent the child in legal action and to make other decisions of substantial legal significance concerning the child).

Conversely, Tonya was not given the same "exclusive" rights, but was only given the rights consistent with those authorized under subchapters B and D of chapter 153 of the Family Code.[15] *See* Tex. Fam. Code § 153.073 (providing that unless limited by court order, a parent appointed as a conservator of a child has certain enumerated rights at all times); *see also id.* § 153.192 (providing in relevant part that unless limited by court order, a parent appointed as possessory conservator of a child has the rights and duties provided by subchapter B and any other right or duty expressly granted to the possessory conservator). The rights granted to Tonya do not include a right to represent these children or to make decisions of substantial legal significance to them. Because a request for a legal name change on behalf of a child involves a decision of substantial legal significance, it is not a right Tonya can exercise under the trial court's present decree.

---

[14] Subchapter C of chapter 153 of the Family Code is titled, "Parent Appointed as Sole or Joint Managing Conservator." *See* Tex. Fam. Code §§ 153.131–.138.

[15] Subchapter B of chapter 153 of the Family Code is titled, "Parent Appointed as Conservator: in General." *See* Tex. Fam. Code §§ 153.071–076. Subchapter D is titled, "Parent Appointed Possessory Conservator." *See* Tex. Fam. Code §§ 153.191–.193.

Given that we have overruled Tonya's challenge to James's appointment as sole managing conservator, Tonya lacks the authority to raise the children's name change in this appeal. We therefore overrule Tonya's fifth issue.

* * *

We overrule Tonya's issues and affirm the trial court's judgment.

/s/    Jeffrey V. Brown
           Justice

Panel consists of Justices Brown, Boyce, and McCally.